J9B3PADS                    Sentence

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,

        v.                        18 CR 454 (KPF)

JONATHAN PADILLA,

          Defendant.

------------------------------x

                           New York, N.Y.
                           September 11, 2019
                           3:30 p.m.

Before:

               HON. KATHERINE POLK FAILLA,

                           District Judge

                  APPEARANCES

GEOFFREY S. BERMAN
    United States Attorney for the
    Southern District of New York
FRANK J. BALSAMELLO
    Assistant United States Attorney

JAMES E. NEUMAN
    Attorney for Defendant

J9B3PADS                         Sentence

1            (Case called)

2            MR. BALSAMELLO:  Good afternoon, your Honor.  Frank

3    Balsamello for the United States.  With me at counsel table is

4    Teddy Cohan, an intern in our office.

5            THE COURT:  Welcome, and thank you very much.

6            Mr. Neuman?

7            MR. NEUMAN:  James Neuman for Jonathan Padilla.

8            THE COURT:  Sir, thank you very much.  And

9    Mr. Padilla, good afternoon to you, sir.

10           THE DEFENDANT:  Good afternoon, your Honor.  How you

11   doing.

12           THE COURT:  I'm doing well, sir, thank you.

13           Mr. Neuman, are there members of Mr. Padilla's family

14   or friends?

15           MR. NEUMAN:  Yes, his mother is here and his uncle.

16           THE COURT:  Are they able to understand, generally

17   speaking, what's happening?

18           MR. NEUMAN:  Yes, yes.

19           THE COURT:  Good to hear that.  Thank you.

20           Let me please make sure I have the documents that I

21   should have.  I have a presentence investigation report that is

22   dated July 8 of 2019.  I have a defense sentencing submission

23   that is dated August 20 of 2019, with letters from family and

24   friends and certificates from BOP programs.  And I have a

25   government's sentencing submission that is dated September 4 of

J9B3PADS                    Sentence

1    2019.

2              Mr. Balsamello, is there anything else I should have

3    for the government?

4              MR. BALSAMELLO:  No, your Honor.  Thank you.

5              THE COURT:  Mr. Neuman, is there anything else I

6    should have for the defense?

7              MR. NEUMAN:  No, your Honor.

8              THE COURT:  All right.  Let me ask a couple of

9    questions.  More of a housekeeping nature.

10             Mr. Balsamello, has the government had a sufficient

11   opportunity under Federal Rule of Criminal Procedure 32 to

12   review the presentence investigation report in this case?

13             MR. BALSAMELLO:  Yes, we have.

14             THE COURT:  I saw that there were some suggested edits

15   from the defense that were accepted by the probation officer.

16   Were there any objections or corrections submitted by the

17   government?

18             MR. BALSAMELLO:  The correction -- there was nothing

19   submitted to probation.  I do discuss in our submission the

20   discrepancy between our criminal history calculation.

21             THE COURT:  We can talk about that now or later.  I

22   actually think the probation office may be correct.

23             MR. BALSAMELLO:  Okay.

24             THE COURT:  Let's hold off on that for now.  With the

25   exception of that guidelines calculation issue, does the

J9B3PADS                        Sentence

1    government have any objections to the PSR?

2                MR. BALSAMELLO:  No, your Honor.

3                THE COURT:  Thank you for letting me know.

4                Mr. Neuman, have you and has Mr. Padilla had a

5    sufficient opportunity under Federal Rule of Criminal Procedure

6    32 to review the presentence report in this case?

7                MR. NEUMAN:  Yes, your Honor.

8                THE COURT:  Do you have any objections to it in its

9    current state?

10               MR. NEUMAN:  No, we don't.

11               THE COURT:  Okay.  Thank you so much.

12               Mr. Balsamello, then let me ask you some questions

13   about the PSR, and then I'll ask them as well of Mr. Neuman.

14   Is the government seeking restitution or forfeiture in this

15   case?

16               MR. BALSAMELLO:  No, your Honor.

17               THE COURT:  Then I will not ask you further about it.

18   Let's talk about the disconnect in the criminal history

19   category.  And as I understand the probation office's view,

20   everybody was in agreement that no points should be assessed

21   for the two sentences of five years' probation, because the

22   conduct that underlay those sentences was relevant conduct in

23   this case.

24               We're all in agreement on that point, correct?

25               MR. BALSAMELLO:  Yes.

1          THE COURT:  As a result, they were not counted.

2          MR. BALSAMELLO:  Correct.

3          THE COURT:  The probation office says if you look at

4    application note 4 to guideline Section 4A1.1, it says that a

5    criminal justice sentence is a sentence that is countable under

6    4A1.2 that has a custodial or supervisory component.

7          What I understood that to mean was that if the

8    sentence counted for points, it also, potentially, could count

9    for this provision.  And my thought was for the same reason

10   that those two probationary terms don't count for guidelines

11   points, it's the same reason they don't count for, if you will,

12   criminal justice sentence points.  Because, in theory, it's all

13   related to this conduct, and I would think you could make the

14   argument to me, and I imagine you will, that this is a case

15   that is not about merely 17 sales to an undercover.  It's as

16   well about this 2009 conduct, and I should keep this in mind

17   and I certainly will.  But, it didn't occur to me that that

18   made it a criminal justice sentence that could be used under

19   Subsection D.  But I will hear you in response.

20         MR. BALSAMELLO:  I think there are two points to make

21   in response to that.  First, under Section 4A1.2, I

22   unfortunately don't have my guidelines in front of me, but I

23   believe there is a subsection within 4A1.2 that's actually

24   headed sentences countable -- I believe it's counted and

25   excluded.

J9B3PADS                        Sentence

1              THE COURT:  There is indeed.

2              MR. BALSAMELLO:  The reason that the sentence is

3     not -- the five-year probationary sentences are not given

4     points under 4A1.1(b) is not the reason in the counted and

5     excluded section if I'm --

6              THE COURT:  I will hand you mine.  I'm sure you'll

7     share with Mr. Neuman.

8              MR. NEUMAN:  I have a copy.

9              THE COURT:  Thank you.

10             MR. BALSAMELLO:  So the Section 4A1.2(c) sentences

11    counted and excluded lists certain categories of crimes.

12             THE COURT:  Yes.

13             MR. BALSAMELLO:  That are, for some reason, because of

14    their nature, trespassing, driving while intoxicated.  They are

15    either counted or excluded sort of categorically because of the

16    crime that's committed.

17             THE COURT:  Yes.

18             MR. BALSAMELLO:  So, our office's position is that

19    when the note refers to sentences that are counted versus not

20    counted under Section 4A1.2, that they're referring to counted

21    and excluded, that is the terminology actually used for

22    4A1.2(c).  That it's not a reference to any sentence for which

23    points aren't attributed under 4A1.2 generally.  It is a

24    specific reference to things that are counted and not counted

25    under 4A1.2(c)(1) and (2).

1          THE COURT:  Whereas here, what you'd say is it's not

2     4A1.2 that excludes it.  It is 1B1.3.

3          MR. BALSAMELLO:  Correct.  Correct.  Because of the

4     relevant conduct aspect here.  And sort of a matter of equity

5     or logic I guess to how this applies also.

6          Your Honor pointed out part of our argument will be

7     this is long running conduct by this defendant.  There had been

8     drug distribution dating back so many years.  So the

9     conviction, the sentence back in 2009, there is a logic to not

10    assessing points for those convictions themselves.

11         But there is a separate harm not accounted for

12    anywhere in the guidelines or anywhere else in this discussion

13    for the fact that he was doing this while under the criminal

14    justice sentence, that he was doing this while on probation,

15    under the supervision of court.  So that is sort of an

16    equitable matter why we think there is a reason to still assess

17    those points.  And then as a technical matter, the reading

18    under the guidelines is that counted and excluded is a

19    reference to these categories of crimes that are definitionally

20    here in Subsection (c).  Counted or excluded is not a reference

21    to just anything that doesn't get points because of the

22    relevant conduct provision, as you said, in 1B1.3.

23         THE COURT:  Okay.  Was that your second argument?  You

24    had said to me there were two arguments.

25         MR. BALSAMELLO:  Right, it is the guideline subsection

1    point, and separately the separate harm.  I think that the

2    points are addressing the fact that there was court supervision

3    while the conduct was ongoing that gives at least a rationale

4    for applying those points that wouldn't apply to hitting him

5    twice for the same conviction.  Those were the two arguments.

6              THE COURT:  I understand that.  And appreciating that

7    the parties have stipulated to a criminal history category of

8    II, you'll understand that neither one of you will consider it

9    a breach of an agreement if I ask for your respective positions

10   on this position, correct?

11             MR. BALSAMELLO:  Correct.

12             THE COURT:  I now understand better your argument and

13   I do appreciate that.

14             Let me see if there are other issues that I want to

15   address with you before speaking more broadly about the

16   sentence.  Do you have knowledge, sir, of the criminal cases

17   that are discussed in paragraphs 54 and 55 and, more

18   specifically, is the one discussed in 55 also relevant conduct?

19             MR. BALSAMELLO:  I would have to look back at the NYPD

20   records that we have.  Standing here, I don't have specific

21   additional knowledge to add to this.  Looking at just the

22   precinct that it occurred in, if this had been a conviction and

23   we were talking about whether there would be points for

24   relevant conduct or whether it's part of sort of the ongoing

25   offense that's bringing us here, I would very likely be taking

1    the position it is part of the same ball of conduct that gave

2    rise to this case.  It is a drug sale in immediate proximity to

3    where this conspiracy was occurring.

4          I don't have the particulars on it in front of me, but

5    it's in the conspiracy period, obviously it is very close

6    geographically and within the precinct.  So I believe that it

7    is, but I can't say definitively.

8          THE COURT:  Fair enough.  By the same token, you are

9    not arguing that it is something different.  You are not going

10   to argue that it is separate criminal conduct that I should

11   consider separate from everything else in the charged

12   conspiracy.

13         MR. BALSAMELLO:  No.  I think it is another instance

14   of the same drug behavior that has brought the defendant here.

15         THE COURT:  Am I correct that there is an arrest for

16   narcotics trafficking in 2009, and then the next one is 2018?

17         MR. BALSAMELLO:  That is -- these are his reported

18   arrests.

19         THE COURT:  Okay.  Are there unreported arrests of

20   which you are aware?

21         MR. BALSAMELLO:  There -- I would have to go back to

22   the file.  But there are additional sealed arrests, absolutely.

23   This is very common in the state.  And I reference and I think

24   it's in the PSR offense conduct section, though not listed

25   under the arrests.

J9B3PADS                        Sentence

1          When probation does the PSR, they go by what they are

2     able to get on rap sheets that they pull.  It is extremely

3     common in the state for an arrest to result in a conditional

4     discharge and drug program, or be disposed of in some way that

5     ultimately it is sealed and not reported to probation.  So I

6     believe that the total number of arrests that we were aware of

7     was 20.

8          THE COURT:  You're anticipating my next question.

9     Because I saw six or so arrests in the PSR, and I saw 20 in

10    your submission, and I wasn't sure about the disparity.

11         MR. BALSAMELLO:  All of the ones in between would be

12    arrests that, for one reason or another, were ultimately

13    sealed.  Many times that means there's not a disposition

14    reflecting guilt.  Sometimes it means there is a plea, drug

15    program, conditional discharge, plea is withdrawn.  There are

16    many different ways the state plays out cases where,

17    ultimately, and unfortunately, at a federal sentencing we don't

18    get a full picture of the person's arrest history.

19         But at the very least we're often able to get a list

20    of the arrests, the fact that they occurred, and the very

21    basics of where they happened within what the top charge may

22    have been.  So, there is, even just here, there was a single

23    arrest listed in 2013, a contempt arrest for domestic violence.

24    But I believe there were also other drug arrests between 2009

25    and 2018, just none of which resulted in unsealed dispositions.

1          THE COURT:  And therefore that I don't have.

2          MR. BALSAMELLO:  And that we have, if the Court would

3    want them, we have, I'm sure arrest reports, complaint reports,

4    things of that nature for each one of them.

5          THE COURT:  But they were resolved in a sealed manner,

6    and I don't know at this time why each one was resolved in the

7    manner that it was.  I mean, you did argue to me that there

8    were 20 arrests and I didn't have substantiation for those

9    arrests.

10         MR. BALSAMELLO:  And if the Court wanted, the best we

11   could provide in terms of substantiation would be the NYPD 61,

12   the complaint reports and the arrest reports.  There

13   wouldn't -- to the extent there would be transcripts or things

14   of that nature, those are under seal.  There would be a

15   different process to get.  But, we are aware at the very least

16   of the occurrence of that many arrests.

17         THE COURT:  I know you'll take this the right way.  I

18   don't have them here with me today, and no effort was made to

19   bring them to me before now.  So, I don't think it's

20   appropriate for me to consider them.  Perhaps going forward, if

21   there are other defendants in this case for whom you think it

22   would be illuminating of some issue for me to know about these

23   other arrests, I should have more substantiation for them.  So

24   I don't think I am going to focus on them for this defendant.

25         Do you have more knowledge than what's in the PSR of

1    the disciplinary incidents?

2              MR. BALSAMELLO:  No, your Honor.  We simply don't get

3    those from the bureau of prisons either.  Probation has some

4    amount of access, at least just of seeing what occurred, what

5    the very basic nature of the offense and what the discipline

6    was that was imposed.  So, we really are limited to what

7    probation is able to access there.

8              THE COURT:  All right.  I understand being in a place

9    that you are not supposed to be in.  I understand less

10   interfering with the security device.  That to me conjures up a

11   whole lot of images, I don't know what it is.  I'll ask

12   Mr. Neuman, and if finance he knows, he will tell me.

13             Let me turn to the defense.  Mr. Neuman, let me begin

14   with a housekeeping matter.  At the very back of the

15   presentence investigation report, there are mandatory, standard

16   and special conditions of supervised release beginning at page

17   24.  Have you been able to review those with your client

18   Mr. Padilla?

19             MR. NEUMAN:  Judge, frankly, I don't think that I

20   reviewed the conditions with my client.

21             THE COURT:  I would like you to do that for this

22   reason.  Number one, I am going to be asking whether he is

23   aware of them and this would be helpful.  Secondly, it would be

24   my preference, if the parties are in agreement, that I would

25   make reference to them as the mandatory, standard and special

1    conditions of supervised release, and not read into the record

2    each one of them.

3              So, would you like to take a moment to review them

4    with your client?

5              MR. NEUMAN:  Yes.

6              THE COURT:  Would you prefer I step off the bench as

7    you do that?

8              MR. NEUMAN:  I think we can do it, I think it would be

9    more efficient if you remained, if you don't mind.

10             THE COURT:  I don't want you to be rushed in your

11   conversations with your client.

12             MR. NEUMAN:  I won't be rushed.

13             THE COURT:  Thank you.

14             (Defendant conferring with his counsel)

15             MR. NEUMAN:  Judge, we've finished up.  I think I was

16   fast, but I believe I gave him all the essential information.

17             THE COURT:  May I address your client directly?

18             MR. NEUMAN:  Yes, please do.

19             THE COURT:  Mr. Padilla, I see now that you've had an

20   opportunity to review the mandatory, standard and special

21   conditions of supervised release with your attorney.  Were you

22   able to do that just now?

23             THE DEFENDANT:  Yes, your Honor.

24             THE COURT:  Did you understand what they provided,

25   sir?

J9B3PADS                    Sentence

1                  THE DEFENDANT:  Yes, I did.

2                  THE COURT:  To the extent you had any followup

3       questions or concerns, were you able to address those with your

4       attorney?

5                  THE DEFENDANT:  Yes.

6                  THE COURT:  So, when I impose sentence in this case,

7       do you agree that I may refer to these collectively as the

8       mandatory, standard and special conditions of supervised

9       release, without reading each of them into the record?

10                 THE DEFENDANT:  Yes, your Honor.

11                 THE COURT:  Thank you.  Mr. Neuman, I presume you

12      agree as well, sir?

13                 MR. NEUMAN:  Yes, your Honor.

14                 THE COURT:  Thank you.  Mr. Neuman, additional

15      questions, please.  Do you have any insight into the

16      disciplinary infractions that I was discussing with the

17      prosecutor a moment ago?

18                 MR. NEUMAN:  Judge, I think the -- the one that

19      involved being in an unauthorized area had to do with trying to

20      make a phone call, if I remember.  Something like that.

21                 Your Honor, may I have a moment?  I'm getting

22      corrected.

23                 THE COURT:  Take whatever time you need.  Thank you.

24                 (Defendant conferring with his counsel)

25                 MR. NEUMAN:  Oh, okay.  Now I'm remembering.  What

J9B3PADS                    Sentence

1    happened is that he changed his cell without permission, which

2    apparently is something that --

3              THE COURT:  You can't do.

4              MR. NEUMAN:  -- you can't do.  Fairly routine, I also

5    understand, but is not allowed.  That's --

6              (Defendant conferring with his counsel)

7              MR. NEUMAN:  Okay.  Judge, I remember now.  He was in

8    the SHU at the time of the other infraction, and was it was

9    Christmas Eve, he was trying to get the attention of the

10   officer to make a phone call to tell his family they wouldn't

11   be able to visit.  And so there is a tray, kind of held on to

12   it to get the attention of the officer.  That's what it was.

13   Put his hand in the slot.

14             THE DEFENDANT:  And called for the lieutenant.

15             THE COURT:  I missed -- I didn't know if you wanted

16   him to speak.

17             MR. NEUMAN:  I think it's okay, Judge.

18             THE DEFENDANT:  Your Honor, what happened was I had

19   came to the box Christmas Eve and there was a visit the next

20   day.  So I tried to get ahold of the SHU lieutenant to see if I

21   could call my family.  They didn't want to let me get a call,

22   so I put my hand in the slot for one minute.  And the

23   lieutenant wrote me up for that.

24             THE COURT:  Were you able to tell your family not to

25   come the next day?

J9B3PADS                    Sentence

1            THE DEFENDANT:  Yeah, but I got written up.

2            THE COURT:  Okay.  Mr. Neuman, let's turn to the issue

3    of the guidelines calculations.  It would not surprise me if

4    you agreed with my views rather than the prosecutor's views,

5    but I do want to hear from you on the issue.

6            MR. NEUMAN:  Yes, Judge.  So, when I saw the report

7    and the prosecutor's letter I tried to, I did try to research

8    this.  I didn't find case law reported on this.

9            THE COURT:  Neither did I, yes.

10           MR. NEUMAN:  My next step is I called the very helpful

11   people at the guideline, I mean the U.S. guidelines commission.

12   They have a hotline.  I don't know if your Honor has used it.

13   It's very helpful, they take questions from prosecutors,

14   judges, lawyers.  And they're terrific.

15           So I called them up, and they agreed with probation.

16   Their reasoning to me is they said it's -- they didn't have any

17   cause law either.  They said it is a matter of interpreting the

18   plain language of these two guidelines, first 4A1.1D, and

19   application note four says that basically refers you to 4A1.2

20   to see what sentences are counted.  In other words 4A1.1(d),

21   application note 4 has a reference there about any criminal

22   justice sentence.  So, if we go to 4A1.2, application note 1,

23   it says prior sentence is a sentence that's essentially -- I'm

24   doing shorthand -- not relevant conduct.  So, in other words,

25   they don't use the phrase "relevant conduct."  They say it has

J9B3PADS                    Sentence

1    to be counted, not otherwise excluded.  So, they also said that

2    they view that two point enhancement for probation, it can't

3    stand alone.  There has to be, they used the phrase it is not a

4    naked enhancement.  It has to be based upon something else

5    that's countable.

6            So, that was the best authority I could get.  It makes

7    sense to me, but I don't have any other precedent to cite for

8    you.

9            THE COURT:  Of course.  Thank you for letting me know.

10   Let me see if I have additional housekeeping questions for you.

11           Let me turn to the government.  Mr. Balsamello, if I'm

12   not mistaken, this is the first sentencing in this case?

13           MR. BALSAMELLO:  That's correct.

14           THE COURT:  As a result of that, I need from both

15   sides a little bit more insight than I currently have into the

16   hierarchy and the nature of this charged conspiracy.  And I am

17   looking for your assistance in that regard.

18           I don't know, for example, I suspect the answer is no,

19   but I don't know if I should discern anything from

20   Mr. Padilla's placement in the indictment, where he's located.

21   I do not know, I'm sensing that he himself was not involved in

22   violent activity.  I'm sensing that the members of this

23   conspiracy may not have been involved in violent activity.

24   But, rather, their sales of drugs in this neighborhood may have

25   fostered a climate in which others felt more comfortable use

J9B3PADS                          Sentence

1   violence.

2          Also, sir, his brother is in this case as well.  And

3   to the extent that one recruited the other or one supervised

4   the other or they were just two individuals in the case of

5   equal culpability I'd like to know that as well.

6          So, I appreciate your permitting me the indulgence of

7   giving you these issues, and I'll hear anything you want to

8   tell me, but I'd also like to know that.

9          MR. BALSAMELLO:  Certainly, your Honor.  Much of what

10  your Honor said is correct, but I'll fill in some detail and

11  give some color.

12         In terms of the structure of the indictment and the

13  order and whether that reflects culpability or hierarchy,

14  things of that nature, to some degree it does.  There are

15  certain ways in which it does and others in which it doesn't.

16         Kawain Nelson we know to have been a supplier to,

17  among other people, James Crooms and for a time Anthony Corley

18  who themselves supplied other people who made street-level

19  sales, including Mr. Padilla.

20         Within the middle of the indictment, though, there is

21  not much that can be gleaned from Mr. Padilla being below

22  Mr. Hudson or above Lamar Griffin.  There is not much rationale

23  there.  In many respects, what these guys were doing was fairly

24  similar.

25         I'll qualify that by saying since charging the case,

J9B3PADS                    Sentence

we've developed a number of cooperating witnesses who have

given us more insight into each person, violence, firearms,

things of that nature, that now if we were to reorder the

indictment may have caused certain shifts.

       But in terms of the way it's structured now and the

drug conspiracy aspect, from Albert Collins through the end,

essentially they're street-level crack cocaine sellers, and the

ways they went about doing it and some of the harms that they

may have had, the effects they may have had on the neighborhood

may have differed in kind, but not necessarily in gravity.

       In terms of violence, we do know of several, we now

know of several individuals on this indictment possessing

firearms in connection with the conspiracy.  We don't know of

Mr. Padilla being involved in any violence himself.  I say that

because there may yet be a superseding indictment with some of

the defendants here being charged in 924 counts.  That is an

aspect of the case.  But you're correct in terms of some of the

most serious acts of violence that occurred in this

neighborhood, we know of a few discharges of firearms,

robberies, burglaries by people on this indictment.  Not

Mr. Padilla directly.

       That said, as your Honor indicated and as I probably

will argue further at the appropriate point, the entire culture

and nature of this community was dramatically and negatively

affected by Mr. Padilla and people who even had his role in

1    this conspiracy in certain ways.  It is interesting you

2    mentioned his brother, because his brother I think was fairly

3    similar in terms of their drug business, what they were doing

4    in terms of the sales.  But just as a way to sort of convey how

5    pernicious this is and how much it sort of consumes people who

6    are involved in this activity, Mr. Padilla's mother, there was

7    a serious discussion about whether she would be charged in this

8    case.

9              THE COURT:  The woman who is behind you?

10             MR. BALSAMELLO:  Yes.  Because the apartment that they

11   operated out of and the building they operated out of, and the

12   way this conspiracy just infected a community, it is very easy

13   I think when we then get to the sentencing of one person to

14   hear that, yes, he is a drug user.

15             In the instance of his mother, who we ultimately did

16   not charge, and there are more mitigating circumstances there I

17   think, but to look at certain defendants and appreciate the

18   circumstances in their lives that make them sympathetic when

19   they are alone here at this sentencing.  Sometimes, though, to

20   lose sight of something the lead detective pointed out to me

21   when I was talking to him about sentencing in this case, which

22   was you move into an apartment building that is, as a

23   structure, is a place to live.  It is a perfectly nice

24   building.  There are families there.  There are parents trying

25   to take kids to school in this neighborhood.  And you step into

the hallway, and you've got Mr. Padilla, his brother, other

conspirators in this case, selling crack, heroin, left and

right.  With the crowds of users and addicts that come along

with it, with all of the poverty and harm and ultimately

violence that trails a conspiracy like this.

     So, while there are sympathetic aspects certainly of

probably every defendant, many defendants who come before the

Court in a drug case, there's also a reason when law

enforcement looks at a community, where there have been a rash

of shootings, where there are routine robberies, they see who

are creating the environment where those things thrive.

     For a month we were intercepting Mr. Padilla's phone,

so we had great insight into how many times drug customers were

coming into this apartment building -- this residential

building where families are trying to live and go about their

lives -- to go get a hit off Mr. Padilla or his brother or, at

times, his mother because they are not home, so they are making

sales in the door.

     In isolation, a single quiet crack sale in a building

would not draw a federal prosecution.  But in an aggregate,

where a conspiracy operates for years at a time and it has such

a damaging effect on the community around it, and it really

does, the government believes, lead to the conditions where the

shootings and robberies occur.  So that is something meaningful

we believe to be addressed in cases like this.

1          There's certainly, we recognize there is absolutely a
2    place in every sentencing to be considering the circumstances
3    of each defendant's life and what brought them here.  But there
4    is also the need to address what they were doing collectively
5    in this neighborhood.
6          That was sort of a long diversion from the discussion
7    about his brother.  But that is sort of how many of these
8    defendants are viewed in this case.  Some of them, as I said,
9    there will be talk of gun possession and instances of street
10   violence and things like that as well.  But that's where
11   Mr. Padilla, even as a non-violent participant in this
12   conspiracy, at least not violent as far as we are aware of,
13   where we believe were the grave harm has been caused by him and
14   the others who were with him, to the point that it even really
15   pulls in family members who maybe on their own wouldn't be
16   involved in selling crack cocaine hand-to-hand, but it consumes
17   the defendants themselves and it consumes really so many people
18   who are living around them just trying to live law-abiding
19   lives.
20         If the Court has any other questions with respect to
21   the conspiracy itself, I'm happy to address them.
22         THE COURT:  I don't believe so.  I'll hear you more
23   generally on sentencing.  Thank you.
24         MR. BALSAMELLO:  Sure.
25         THE COURT:  Let me be more precise.  It is my

J9B3PADS                    Sentence

1   preference that you not rest on your submission.  So, if you

2   have told me everything you want to tell me, including the

3   answering of my questions, then certainly sit down.  But if

4   there are things you'd like to highlight in your written

5   sentencing submission or other things you'd like to call to my

6   attention, I do want to give that you opportunity.

7            MR. BALSAMELLO:  There are some others.  I won't

8   repeat things I just said.

9            Turning to Mr. Padilla specifically, because I was

10  mostly responding to sort of the structure of the conspiracy

11  question and the harm they caused generally.

12           Mr. Padilla, as his criminal history reflects, has

13  been involved in selling drugs in his community for many years.

14  Regardless of how that's calculated under the sentencing

15  guidelines, he has done it while on probation, after being

16  sentenced by a court for the same conduct.  He's been arrested

17  a multitude of times, he's gotten in trouble while he's been in

18  federal custody.

19           For those reasons, especially, again, I come back

20  again to a conversation I had with the lead detective on the

21  case who did much of the surveillance and who oversaw the

22  controlled buys.  I was talking to him about what our positions

23  would be at certain sentencings.  And he started to describe

24  again just the -- the things that's hard to capture in a

25  courtroom or in a sentencing submission or in any way when

1    we're removed from the community where this stuff happens.  The

2    crowds of people that form.  The groups that go to make these

3    buys, the groups that are selling.  The shouting back and forth

4    about who's got product where.  Bringing each other into sales

5    when they don't have product.  In many respects, several of

6    this defendant's buys, he either had product on hand when he

7    was contacted by the undercover.  He typically had product.  If

8    he didn't, he knew right where to go, and there was a

9    co-conspirator to go to.

10          The amount of traffic and the economy created in a

11   community by the day-to-day hand-to-hand drug sales that,

12   again, in isolation can seem like they're not the most serious

13   thing in the world if you look at a single instance or a couple

14   of instances of a drug sale to a customer.  When you think

15   about it day after day, hour after hour, for years at a time, I

16   think that's something that the law enforcement folks we work

17   with before we charge cases, that's what they're seeing and

18   hearing when they are talking about who we should charge and

19   why.

20          It was helpful for me to remember, even going into a

21   sentencing like this where it is drug conduct, admittedly we

22   are not talking about someone who shot someone himself or who

23   was running around with a gun, causing that kind of harm.  But,

24   it's helpful to remember the source of harms and the ways that

25   this kind of drug conspiracy creates the environment where

J9B3PADS                    Sentence

those other things do happen and where it becomes accepted and

commonplace for kids to be around, amidst crack is cooking in

this apartment.  Customers over here.  Dope customers there.

It's constant and it goes on for a long time with a lot of

people.  So Mr. Padilla was certainly one of them.  From

hearing his phone, this was his business.  This was how he

lived.  It was the way he supported himself.  And part of

supporting himself was supporting his own use.

So, we know full well that he knows the harm that

comes with being a drug user.  But he was perpetuating those

harms too.

We do think it is important to deter others in that

community who know there was a federal case that came out of

this.  So they see there is a real consequence to a federal

drug prosecution.  Often in the state there aren't consequences

for drug cases.  And if anything, they're moving in a direction

of there being fewer consequences.

THE COURT:  Just one moment, please.  Let me probe

this a little bit.  You are speaking now general deterrence and

this I understand.  Do you perceive that there is a deterrent,

an incremental deterrence between the mandatory minimum

sentence that applies here, the guidelines range that the

probation office calculated, and the guidelines range that is

calculated in the government's plea agreement?

MR. BALSAMELLO:  I think there is something

J9B3PADS                    Sentence

incremental, and I think there are other important reasons.
The distinction between the minimum where the Court would be
telling the defendant you get the lowest thing I am allowed to
give you versus the guideline ranges that are at issue.  I
think the guideline ranges themselves, there is a nine-month
overlap between them.  There is not a tremendous difference
between what we had agreed to and what probation calculates, so
I think there's a sentence in that area that's -- there may not
be a dramatic difference in terms of general deterrence between
72 and 78 months.  But I do think there is something meaningful
in terms of a message of the minimum.  The lowest thing that
can be given will be given.

        I think for there to be a sentence above the mandatory
minimum I do think has some additional deterrent value.  We've
actually, in connection with this case, there is a sort of
companion case that we're prosecuting before Judge Swain where
we searched some cell phones of some guys who had been
supplying drug dealers in the same area.  We saw a text message
from one brother to another with the press release from this
arrest and a discussion about Feds are coming, they ain't
playing.  Because of a case like this.

        So that doesn't mean that Mr. Padilla is the most
culpable of the murderers that have operated there or the
highest level drug suppliers, but, it does mean that people in
that community, and especially people who are involved in this

J9B3PADS                         Sentence

1    very criminal activity, know when 10 or 12 or 15 of their

2    associates get taken at the same time, and then what happens to

3    them.

4              Very often, state prosecutions, they're back very

5    quickly.  And I think that sometimes that's how we end up with

6    cases where someone's arrested 10 and more times, because it

7    can be there never is that message that there is a consequence.

8              So we do believe that a sentence we think in our

9    negotiated range is appropriate to accomplish that goal.  I

10   think for the same sort of reasons respect for the law is

11   implicated here.  I think there is a need to specifically deter

12   Mr. Padilla who has been in trouble before.  Even if they've

13   been sort of minor disciplinary infractions, even while at the

14   MCC he's been defiant and sort of resisted authority in a way

15   that the Court should consider at least to some degree.

16             I think the overriding thing, though, that those who

17   have worked on this case and the government generally I think

18   wants to accomplish with this is to protect the community from

19   Mr. Padilla and from the broader, again, the broader conspiracy

20   that existed here.  That if he and any number of these

21   defendants are back within a couple years, it will be the same

22   thing again is a very real concern.  As it has happened before

23   when he's had cases before and is back, and the same conduct

24   continues.

25             So given those objectives of sentencing under Section

1    3553(a), they're both accomplished with a sentence within the

2    range that we've negotiated in the plea agreement.

3              THE COURT:  Thank you very much.

4              MR. BALSAMELLO:  Thank you.

5              THE COURT:  Mr. Neuman, I'll hear from you now, sir.

6    And you are welcome to respond to the issues that I've been

7    discussing with Mr. Balsamello.  For you in particular, I think

8    I'd like to understand what plans your client has for reentry

9    into the community.  There was I think a miscommunication with

10   his niece, not about where he would be living, but, if indeed

11   he's had a number of arrests and several of them have been for

12   narcotics sales, it's not clear to me why this one differs.  So

13   I'll hear from you on anything you'd like to speak about, but

14   I'd like you to focus on those things too.

15             MR. NEUMAN:  Okay.  I'll try to go somewhat

16   sequentially here.

17             THE COURT:  Of course.

18             MR. NEUMAN:  Judge, we're not here to doubt the

19   scourge of drugs in the neighborhood.  Nobody disputes that.

20   But I think it's clear from the prosecutor's presentation,

21   Mr. Padilla is a street-level drug dealer and he's an addict.

22   And he has been for a long time, and he's been committing, he's

23   been selling drugs and using them for a long time.  And he

24   sells to support his habit.  We admit that.  He is not by any

25   stretch any kind of manager or organizer, did not enlist his

brother to do these crimes.  I'm told they don't even get

along.  There is no hint in what I've seen that he has

committed any violence in connection with these crimes.  It

sounds to me like he is as low level as they come.  The

distinction being it's been going on for a while, and that's

true.  We do acknowledge that.

But, the government mentioned about how it's sometimes

hard to convey something in a sentencing memo.  Well, what I

really want to convey is the kind of person that Mr. Padilla

is.  What I have seen personally when I've represented him,

been representing him, is a person who has been struggling

with, trying to find a balance between taking responsibility

for himself, and using drugs, and medicine, and relying on

other people.  And let me break that down.  It goes into his

history.

I've detailed how at a young age he was diagnosed with

various conditions.  ADD, bipolar, anxiety, depression.  His

mother just mentioned to me before court that her recollection,

he was actually once diagnosed as schizophrenic, which I did

not know.  And during those years, he received some counseling

and some medication.  But I think that from speaking to the

family and Mr. Padilla personally, it sounds like they didn't

really get the medication right.  Sometimes it had a bad

effect.  His family told me just recently that it made him less

responsive and he didn't like the medicine, and then would go

off of it, and self-medicated with opiates, which he became

severely addicted to.

      What I see also though is he's trying to take -- by

not taking the medicine, it is actually a form of -- I think it

is taking responsibility for himself.  It was a misguided

thing.  He is trying to do it by himself.  This also has come

up during his time while this case has been pending.  I believe

he's not been taking the medication offered at the MDC.  I'm

not sure that they offer all of the options that you might get

on the outside.

      What he has done is put himself through a really

incredible regimen of physical fitness, and has transformed

himself.  This is, to me, very, very significant because I know

how closely it is tied to self-esteem.

      When he was a kid, 13, I think he said, he weighed

about 200 pounds.  And this is something that he struggled with

for decades and affected his image, and he did have very low

self-esteem.  And in the past few years, he has decided he's

going to take responsibility for that.

      I know this might sound trivial to some people, but

it's not to me.  I know the effect of physical health.  And

when you're able to lose something like 150 pounds, and become

really in peak shape, this is not something that's common in

prison.  They all have time to exercise.  They don't do this.

When you do that, it gives you a sense of pride and

accomplishment.

And when I've talked to him in recent months, he does have a plan about what he wants to do.  He wants to get a GED. He's been asking for tutoring from other inmates on math because he struggles with that.  He's taken it a number of times, but he's failing, but he's determined to get it.  He wants to get a commercial driver's license because he knows that's a good plan.  He's told me when he gets transferred to a halfway house, he's got an idea.  He is going to work as many hours as he can work, and he does have a history of that, even while he was committing those crimes he was at least for a couple of years employed full-time.  He's planning to save every cent so when he gets out, he can put a deposit down and get his own place.

Now, I can also say I spoke to his family about what was mentioned about this niece not wanting -- that I found it odd.  Probation spoke to one particular person and got that information.  Maybe they weren't, maybe when others were not around.  He did not speak to his mother, did not speak to another niece, and his uncle who is here, and other people have told me there is a place for him when he gets out.  If he needs a place, they will put, they will gladly have him.  So, okay, one niece did not want him to be there.  And I understand that, she's got children.  Mr. Padilla has a long history of drug abuse.  It's completely natural that she wouldn't want him

1    there, even though she obviously loves him at the same time.

2    But it is not true to say he doesn't have a place to go.  He

3    does have a place to go, he's got a lot of support from his

4    family.  And in any event, what he wants to do is he wants to

5    get his -- he does want to get his own place in a different

6    neighborhood from where he grew up.  He wants to continue with

7    his fitness regimen.  He thinks he can get some part-time work

8    doing that.  That's not really his long employment goal.  It is

9    more a passion for him at this point.

10           Another thing that's important is he is determined to

11   reestablish relationship with his daughter.  And you may recall

12   from my memo that he had a longterm relationship with the

13   girlfriend, the daughter was born in 2012, they were together,

14   Mr. Padilla was supporting both the girlfriend and the daughter

15   for about three or four years when they lived together.  Then

16   they broke up, which was a very upsetting experience for my

17   client.  He continued to support his daughter.  He asked the

18   Court for visitation, was granted it.  The daughter would come

19   around on the weekends.

20           Now, while he has been in here, I think recently he

21   has been served with papers where I think his girlfriend is

22   trying to interfere with his rights or limit them in some way.

23   Full custodial rights.  This is something that I'm trying to

24   help my client with.  He's very concerned about it.  He wants

25   to fight that, which is difficult.

1          But, my point here is that his plan is to be a father

2     when he gets out.  His plan is to work full-time.  His plan is

3     to get a GED.  His plan is to start as a dishwasher, but move

4     up.  And I think that for the first time in his life, he has a

5     sense that he has the ability to do these things.

6          (Defendant conferring with his counsel)

7          MR. NEUMAN:  My client is just reminding me he would

8     like a chance to speak when this is done.

9          THE COURT:  Of course.

10         MR. NEUMAN:  So I'll make sure he will have that

11    opportunity.  My client has told me he thinks this arrest has

12    saved his life.  That is not something I hear from most people.

13    I believe it.  I believe he is sincere when he tells me this.

14    He knows how terrible drugs are.  He has no intention of going

15    back to this.  While he's been arrested many times, it's true,

16    he's never served a sentence anywhere close to this.  I think

17    was it -- I am not sure even more than a few months.

18         THE DEFENDANT:  I did 18 months.

19         MR. NEUMAN:  18 months as a juvenile in a juvenile

20    facility.  That was it.

21         As far as specific deterrence is concerned, I can tell

22    you, the difference between the minimum 60 months, what I'm

23    talking about, and something in the 70s, that's not going to

24    have any impact on my client about whether he is going to do

25    this kind of behavior again.  Five years is plenty to persuade

1    him this is not a good thing.

2           I will also say I find it quite implausible that

3    anybody on the street is going to think, well, this guy, he got

4    five years, but he could have gotten six or seven years and

5    that's somehow going to be an incentive or not a deterrent to

6    them.  I don't think that's the way people work.  The

7    government was adamant that he receive a (b)(1)(B).  Five-year

8    minimum.  That's a deterrent, Judge.

9           It would be one thing if he were here and he was

10   facing a (b)(1)(C) and we would be talking about whether he

11   should get two years or something like that.  But we're not

12   talking about that.  Nobody is suggesting that someone in

13   Mr. Padilla's position be let out in a couple of years.  It so

14   happens he's been in jail for a couple of years already, but it

15   is a five-year minimum sentence.  That's substantial for

16   someone who is an addict and has had a lot of problems, and

17   he's working through them and I do see first hand someone who

18   has growing self-esteem.  And I think that if he's under proper

19   supervision, and by that I mean, he's given a program when he

20   gets out -- and incidentally, he wants very much to attend a

21   residential drug treatment program while he's in, something he

22   specifically asked me to ask your Honor to recommend.

23          I think that he recognizes that he does have some

24   psychological issues that need some kind of counseling.  And I

25   hope in the future that we can find a proper balance of

1    medicine.  That's not always easy to do.  But, he knows he

2    needs help.  He doesn't -- he wants to be there for his

3    daughter, and he's not going to do this again.  And I think

4    I've covered everything.  If you have anything else I can

5    respond to.

6              THE COURT:  I have no specific questions.  Thank you

7    very much.

8              Mr. Padilla, at this time I understand you'd like to

9    speak and I invite you to do so.  I do want you to be aware you

10   are not obligated to speak with me, but if you wish to do so, I

11   will take very seriously all you will say.

12             What I will ask you, sir, just because of the

13   acoustics in this courtroom, if you could please speak a little

14   louder and a little slower than you might otherwise in your

15   conversations with others, because I want to make sure everyone

16   in this courtroom, including the folks in the gallery, hear

17   from you.  Thank you, sir.

18             THE DEFENDANT:  Yes.  Good afternoon, your Honor.

19             THE COURT:  Good afternoon, sir.

20             THE DEFENDANT:  I'm not coming here with like a letter

21   written to tell you something that you heard a million times

22   before.  I made a lot of mistakes in my life, constantly doing

23   the same thing, going back to jail and coming back out, because

24   I had a fear of hopelessness and failure.  When a person goes

25   to jail and they come out and they have a record, they feel

like they can't do nothing better but that same exact thing.

Because they feel like I can't get a job, I can't do this, I

can't do none of this, because I already went to jail.  I have

a felony.  So it's that doubt in the back of your mind that

gives you that, that thought where you set yourself up for

failure.

        So it was like now that I been here, I got a chance to

rehabilitate myself physically and mentally and know that

there's hope, and this is not the end of the road.  I know I

can come out and do other things to better myself and better my

life.

        I would like to apologize to my family, to the

families that I destroyed selling them the drugs, and my

daughter as well, because she's seven years old and she's not

getting no younger and I'm not getting no younger.  I'm getting

older.  I'm 30 years old now.  I been selfish to myself,

leaving my kid behind, coming to jail behind and being a

disappointment.

        And I do say at this stage in my life, because I got

hit by the Mack truck this time.  Maybe before I went to the

state, I got a little locked up in Rikers for five, five

months, it wasn't a bad penalty.  Now I can see how serious

things can get, and I got to sit here and really think and be

around people that I'm around every single day in here that got

30, 40 years, and may not got a chance to come home again.  So

1    I got to see things from a different light.

2              Not that I'm coming here for a pity party from any of

3    y'all.  I am coming to tell you how I feel honestly as a man.

4    And you know, like, my mental health states and my depression

5    and anxiety all the stuff that I dealt with my whole life, I

6    found other ways, like exercise, music, books, and other things

7    to try to cope with things.  I feel like pills and drugs ain't

8    the solution to everything.  I was taking Xanax when I was home

9    from my psychiatrist and other type of mental health

10   medications that was stabilizing me, but it wasn't stabilizing

11   me.  It was a super hero pill that I was taking that was just

12   narrowing me out.  So as to the point where I'm high, so of

13   course, nothing's bothering me.  So I'm getting a case of "F

14   it," you know what I mean, everything doesn't matter.

15             But now I got the chance to really clear my mind and

16   look at things and see what's more important and more valuable.

17   And this is not it.  Whether you guys want to believe me or

18   not, or he wants to paint the picture however he wants to paint

19   it, that's cool.  I am not here to tell anybody how to do their

20   job.

21             All I'm telling you, ma'am, I am coming here to talk

22   to you as an adult to tell you this is sincerity in my voice.

23   I got to see things from a different light.  I just hope

24   whatever decision you make today, you make the right one.  Have

25   a blessed day.

1          THE COURT:  Mr. Padilla, Mr. Neuman may have told you

2     this.  If not, I will tell you that, unlike most judges in this

3     district, I take a break between hearing from everybody and

4     imposing sentence.  And the reason I do that is because I do

5     not come to this proceeding with a sentence already in mind.

6     It is very important for me to keep an open mind until I've

7     heard from everyone, and you are the last, and on many levels,

8     the most important person from whom I hear.

9          I am going to ask for your patience while I step off

10    the bench and gather my notes together, because I want to make

11    sure again that I have a moment to think clearly about

12    everything I've heard today and about everything I've read in

13    preparation for this sentence.

14         Mr. Balsamello, is there something you wish to add?

15         MR. BALSAMELLO:  May I respond briefly to something

16    Mr. Neuman said?

17         THE COURT:  You may sir, yes.

18         MR. BALSAMELLO:  Something I think worth considering

19    is the degree to which five years –– he is saying five years is

20    not we are not (b)(1)(C) world where we're talking two or

21    three, but five years is not actually five years, and

22    Mr. Neuman highlighted two ways that it's not:  The residential

23    drug program and the halfway house.  Both of those together

24    could result in Mr. Padilla doing considerably less than five

25    years if he's given a five-year sentence.  And that is

1    something that we know from talking to cooperators, people in

2    the street do notice.  That cooperating witnesses in a case are

3    still sitting in and hearing that someone is getting out a year

4    later because they are going to go to the halfway house and

5    they've done the drug program.  Five years is not a full 60

6    months in terms of time spent incarcerated, and from speaking

7    with witnesses and people who have been involved in

8    conspiracies like this, I know they do notice how long people

9    are aware for.  That five versus six versus seven is, we

10   believe, material.

11             THE COURT:  Again, just to probe this issue a little

12   bit further.  One has to complete successfully the RDAP program

13   before one gets any break on their sentence.  Is that not

14   correct?

15             MR. BALSAMELLO:  I believe that's correct.

16             THE COURT:  Right.  So recommending, if indeed I do

17   recommend, Mr. Padilla for this program, that that's not what

18   guarantees him any shortening of his sentence.  It is his work,

19   his successful work, if indeed he is successful, that results

20   in the reduction of the sentence.  Also correct?

21             MR. BALSAMELLO:  That's fair.  It is a degree to which

22   the punishment for the crime, though, is mitigated by something

23   he then does after the fact.  And the halfway house is another

24   way that the sentence is augmented a bit in a way that I think

25   people do realize, in a way that affects the general deterrent

J9B3PADS                          Sentence

1    effect of it.

2              THE COURT:  All right.

3              MR. BALSAMELLO:  Thank you.

4              THE COURT:  I've taken the note.  Thank you.

5         Mr. Neuman, as you can tell from -- well, you have

6    heard my discussion with Mr. Balsamello.  I think I do

7    understand both sides of the issue, but if you or your client

8    wish to be heard on that one point, I'll hear from you.

9              MR. NEUMAN:  No, Judge.  I think I said everything.

10             THE COURT:  Thank you very much.  I'll be back as soon

11   as I can.  If it's possible for the marshals to allow

12   Mr. Padilla to speak with his family members, I would

13   appreciate it.  Thank you.

14             (Recess)

15             (In open court)

16             THE COURT:  What I'm going to do now is outline the

17   sentence that I intend to impose, and then I will give each

18   side an opportunity to make legal objections before I actually

19   impose sentence.

20        We've spoken a lot this afternoon about the factors

21   that are set forth in Section 3553(a) of Title 18 of the United

22   States Code, and the ones that I focused on this afternoon are

23   as follows:  The nature and circumstances of the offense, the

24   history and characteristics of Mr. Padilla, the need for the

25   sentence imposed to reflect the seriousness of the offense, to

J9B3PADS                    Sentence

1    promote respect for the law, to provide a just punishment for

2    the offense, to afford adequate deterrence to criminal conduct,

3    to protect the public from further crimes by Mr. Padilla, to

4    provide him with needed educational and vocational training,

5    medical care or other correctional treatment in the most

6    effective manner.  I must consider the sentencing guidelines,

7    and I'll speak about them momentarily, and I must consider the

8    need to avoid unwarranted sentence disparities among similarly

9    situated defendants.

10          So, I ultimately agree with the probation office's

11   calculation of the guidelines in this case.  The base offense

12   level is 30, and there is a three-level reduction for

13   acceptance of responsibility, yielding an adjusted offense

14   level of 27.  But I read, as apparently the guidelines or

15   sentencing commission hotline does, recognizing the merit and

16   the thoughtfulness of Mr. Balsamello's position, I feel more

17   comfortable finding that it is not countable.  I agree it could

18   have been drafted better.  But in all candor, it wouldn't make

19   a difference, because I would impose the same sentence that I'm

20   about to impose, irrespective of whether I found Mr. Padilla to

21   be in criminal history category II or I.

22          In this case, however, I find that he has no criminal

23   history points and that he is in criminal history category I,

24   and that the resulting guidelines range is 70 to 87 months.

25          I appreciate very much the efforts on both sides to

J9B3PADS                    Sentence

1   give me a more complete picture regarding Mr. Padilla, and I

2   want to just ask something beforehand regarding a possible

3   correction to the PSR that I meant to mention at the beginning.

4   If I could ask the parties to look please at paragraph number

5   eight, I think this is a tiny little glitch, but it suggests

6   that the sanctions imposed for Mr. Padilla being in an

7   authorized area, which would be a strange thing indeed.  So I

8   just, just because someone at the BOP may read this report and

9   do something with it, is there any objection to my correcting

10  it to make it "unauthorized area"?

11            MR. BALSAMELLO:  No, your Honor.

12            MR. NEUMAN:  No, your Honor.

13            THE COURT:  Thank you.  Again, I am not being glib

14  here, but I don't know how folks at BOP read those documents,

15  so it might as well be accurate.

16            Let me move from that housekeeping measure and turn to

17  the very important issue of Mr. Padilla's sentencing.  As in

18  many cases, and as I expect with other defendants in this case,

19  there are very good and very bad and very sympathetic qualities

20  to Mr. Padilla.  I do appreciate the improvements that he has

21  made to himself mentally and physically while incarcerated.  I

22  appreciate the fact that he, with the assistance of his

23  counsel, has worked on a plan for reentry into society.  And I

24  appreciate the fact that he has been addressing certain mental

25  health and issues that he has had.  And I think I understand

1    why he might forgo medication in favor of healthier living, or,

2    as he said I believe, exercise and music and reading.  And I

3    hope and I know he does, too, that someday he passes the GED

4    and actually has that, because I think that will open up more

5    employment opportunities for him.

6              On the other side of the scales is the amount of time

7    that he was involved in this conspiracy, and the sheer number

8    of transactions in which he was involved and the fact that it's

9    nearly nine years.  And even he realizes the harm that he and

10   others have done to the neighborhood.

11             I begin at the guidelines range of 70 to 87 months.  I

12   suppose I begin as well as another guidepost with the mandatory

13   minimum term of 60 months.  And ultimately, I've decided to

14   impose a term of 66 months' imprisonment.  I do think there

15   needs to be more than the bare minimum mandatory minimum.  But

16   I also don't think that a 70-month sentence is necessary, and I

17   think that there are things that Mr. Padilla has done in prison

18   that warrant my recognizing this in terms of sentencing, and I

19   therefore do.

20             So just on the point, on the discussion that I was

21   having at the very end with Mr. Balsamello, it may be that

22   Mr. Padilla completes successfully the RDAP program and that

23   gets him additional time off his sentence.  It may be that he

24   qualifies for halfway house treatment at some point in the very

25   late stage of his sentencing.  In those regards, however, his

destiny is in his own hands, and it is up to him to complete

the program.  One does not go into the program and then get

time off.  He has to do something.  He has to go through 500

hours I believe of the program.

So, I am willing to let Mr. Padilla put his fate in

his own hands for those things, and if it turns out that

results in additional reductions in his sentence, then so be

it.

But I'm imposing a term of 66 months' imprisonment,

and I'm ordering that term be followed by a term of supervised

release of three years with the mandatory, standard and special

conditions that have been outlined in the presentence

investigation report.

I am not imposing a fine.  I am not imposing

restitution.  I'm not ordering forfeiture.  But I am obligated

to impose a $100 mandatory special assessment.

Mr. Balsamello, is there any reason why I may not

impose this sentence?

MR. BALSAMELLO:  I think, your Honor, under Section

(b)(1)(B) it is actually a mandatory four years.

THE COURT:  You are exactly right and thank you.  Yes.

In recent sentencings involving your office, folks have gone to

the (b)(1)(C) level, and I think that was the note I had in my

mind.

It will be four years of supervised release.  Thank

J9B3PADS                        Sentence

1    you for that.

2              Other than that, sir, is there any reason why I may

3    not impose this sentence?

4              MR. BALSAMELLO:  No, your Honor.

5              THE COURT:  Mr. Neuman, with that correction, this

6    does have to be four years, sir.  Is there any reason why I may

7    not impose this sentence?

8              MR. NEUMAN:  No, your Honor.

9              THE COURT:  Mr. Padilla, please rise.

10             Mr. Padilla, after considering all of the sentencing

11   factors set forth in Section 3553(a) of Title 18 of the United

12   States Code, I find that a term of 66 months' imprisonment is

13   sufficient, but not greater than necessary, to comply with all

14   of the purposes of sentencing.  I will order that term of

15   imprisonment be follow by a term of four years of supervised

16   release with the mandatory, standard and special conditions

17   that are set forth in the presentence report.  I will not

18   impose a fine or restitution or forfeiture, but I must impose a

19   $100 mandatory special assessment.

20             Do you understand that, sir?

21             THE DEFENDANT:  Yes, your Honor.

22             THE COURT:  Sir, please be seated.  Thank you.

23             Mr. Neuman, you've asked for and I will grant the

24   recommendation or the request that, as BOP deems appropriate,

25   that Mr. Padilla be placed in a residential drug abuse program.

1    Is there a further recommendation that you'd like me to make

2    regarding place of designation?

3                MR. NEUMAN:  Yes.

4                THE DEFENDANT:  Danbury --

5                MR. NEUMAN:  So Judge, I'm not sure if you'd like to

6    get this specific.  My client's preferences are Danbury or Fort

7    Dix.  I usually simply ask for as close as possible to New York

8    City, and I know his priority, it has to be a place that does

9    offer that residential drug treatment program.

10                THE COURT:  That's fine.  I have in the past

11   recommended or asked for specific places, recommended specific

12   places, and I don't mind doing that here.  What I was told by

13   the bureau of prisons is that I should have a fallback position

14   if it turns out those facilities do not have the requested

15   space, because otherwise, the defendant will end up anywhere

16   they have space, which could be a different coast.

17                MR. NEUMAN:  That's my concern.  Perhaps you could say

18   either Fort Dix or Danbury, or if that doesn't work, a facility

19   close to New York City.

20                THE COURT:  That is exactly the way we will phrase it.

21   Danbury and Fort Dix, and failing those, a facility that offers

22   an RDAP program in the New York City metropolitan area, as

23   close to it as possible.

24                MR. NEUMAN:  Perfect.

25                THE COURT:  We'll do that.

J9B3PADS                          Sentence

1          Let me have your attention for just one moment.  I'm
2   advised there may be another hiccup in the PSR.  My deputy, who
3   reads these documents with great care, reminds me that even the
4   probation officer had some confusion about whether the
5   appropriate range was 70 to 87 month or 78 to 97 months.  So,
6   given, as you can see on page 22 of the PSR, she finds criminal
7   history category II, even though throughout the rest of the PSR
8   she has found it as criminal history category I.  So I'm going
9   to find and I will therefore make corrections to those portions
10  of the PSR that recite a criminal history category of II, and
11  that it be 70 to 87 months.
12          Mr. Balsamello, any disagreement with that?
13          MR. BALSAMELLO:  No, your Honor.
14          THE COURT:  Mr. Neuman, any disagreement?
15          MR. NEUMAN:  No, your Honor.
16          THE COURT:  Mr. Padilla, to the extent that you have
17  not waived this in any agreement that you may have with the
18  government, you have the right to appeal from your conviction
19  and from your sentence.  If you're interested in appeal, please
20  speak with Mr. Neuman at your earliest opportunity, because,
21  generally speaking, you have two weeks from the date that I
22  file the written judgment of conviction to file a notice of
23  appeal.  And my expectation is that I will be filing the
24  judgment some time tomorrow.  So if appeal is something in
25  which you're interested, please discuss it with Mr. Neuman.  Do

1    you understand that, sir?

2              THE DEFENDANT:  Yes, your Honor.

3              THE COURT:  Thank you.  Mr. Balsamello, I don't know

4    if there are underlying charges instruments that require

5    dismissal.  Are there?

6              MR. BALSAMELLO:  No, your Honor.

7              THE COURT:  Sir, let me ask you, is there anything

8    else we should be addressing?

9              MR. BALSAMELLO:  Not from the government.

10             THE COURT:  Mr. Neuman, anything else we should be

11   addressing?

12             MR. NEUMAN:  No, your Honor.

13             THE COURT:  May I address your client directly, sir?

14             MR. NEUMAN:  Please do.

15             THE COURT:  Mr. Padilla, I want you to understand

16   you've been very well represented in this case, and I accept

17   what you've said to me, which is this experience has been just

18   very different from your prior state court experiences.  I'm

19   sure you understand that the very last thing that you want to

20   do is to see me again in this context.

21             So I wish you well in completing your sentence.  I

22   hope your daughter is able to see you more frequently.  I hope

23   that you're able to put in place the plans we've been talking

24   about this afternoon.  And it is my hope, and I know you will

25   take no offense at this, that you and I not see each other in

1   this setting again, because if we do it means you have violated

2   the terms of supervised release, and I can assure you that any

3   leniency that I've shown you this afternoon, I will not show

4   you again.

5            So I wish you well, sir, even if this means this is

6   our last time seeing each other today.

7            With that, we are adjourned.  Thank you very much.

8            (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25